UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ADA FIGUEROA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 14-12399-ADB |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER

July 21, 2015

BURROUGHS, U.S.D.J.

## I.  Introduction

Plaintiff Ada Figueroa ("Figueroa") has brought this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g) (the "Act"), challenging the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for Social Security Disability Insurance ("SSDI") benefits and Supplemental Security Income ("SSI") benefits. Before the Court is the plaintiff's "Motion for Judgment" [Dkt. 14], seeking a reversal of the denial of benefits or, in the alternative, a remand for further administrative proceedings. Also before the Court is the defendant's "Motion to Affirm the Commissioner's Decision" [Dkt. 24], seeking an order affirming the denial of benefits. At issue is whether the Administrative Law Judge ("ALJ"), in reaching his decision that Figueroa was not disabled, erred by: failing to give appropriate weight to the opinions of her treating physicians; finding that she was not fully credible in her subjective complaints; failing to properly assess the combined

impact of her impairments; and failing to take into account the deleterious effects of her chronic headaches.

As described below, the Court concludes that the ALJ's decision was supported by substantial evidence. Therefore, the plaintiff's motion for judgment is DENIED, and the defendant's motion to affirm is ALLOWED.

## II.     Background[1]

### A.     Summary of Relevant Facts

Figueroa is a 41-year-old woman who claims to be disabled by a combination of mental and physical impairments, including anxiety-related disorder, fibromyalgia, and chronic headaches. [Tr. 20; Pl.'s Mot. at 4.] She was born on May 2, 1974. [Tr. 25, 701.] She was 28 years old as of her alleged disability onset date of September 23, 2002, and 37 years old as of July 13, 2011, when she applied for Social Security benefits. [Tr. 18.] She dropped out of school at age 12 but later earned a GED. [Tr. 143, 232, 701-02.] She previously worked as a cashier and then part-time as a home health attendant for her aunt. [Tr. 25, 143, 184, 733.] The home health attendant job, her most recent position, included cooking and some cleaning. [Tr. 704.] She quit that position in approximately 2002, when she was in her late-twenties, because she could not get along with her grandmother (who lived with her aunt), and became depressed. [Tr. 143, 184, 703-04.] Since leaving her job as a home health attendant in 2002, she has not returned to the workforce, although she applied for (but was not offered) a job at a Dunkin Donuts after she stopped working for her aunt. [Tr. 704-05.]

---

[1] References to pages in the transcript of the record proceedings are cited as "Tr. __." The ALJ's decision can be found beginning at Tr. 18. The administrative hearing transcript can be found beginning at Tr. 697. The plaintiff's motion for judgment is cited as "Pl.'s Mot." The defendant's motion to affirm is cited as "Def.'s Mot."

The ALJ found Figueroa to have three severe impairments within the meaning of the Social Security law and regulations: anxiety-related disorder, fibromyalgia, and chronic headaches. [Tr. 20; Pl.'s Mot. at 4.] She also has asthma and hypertension, but the ALJ found that these impairments are under adequate control and are therefore not considered to be severe [Tr. 20], a finding that the plaintiff does not contest in this action.[2]

As of January 13, 2013, the date of her administrative hearing before the ALJ, Figueroa had not worked in more than ten years and was living in an apartment with her three adult children. [Tr. 703, 715-16.] She reported spending her days primarily sleeping and watching television in her bedroom, venturing outside the apartment only infrequently. [Tr. 709, 714, 722.] Her daughter did most of the household chores, but Figueroa occasionally went food shopping (accompanied by one of her children), did light cooking, and swept the floor. [Tr. 716, 726.] She reported experiencing panic attacks, anxiety, fatigue, and suicidal thoughts. [Tr. 728-29.]

Additional facts relevant to the Court's analysis are addressed below where appropriate.

**B.      Procedural History**

On July 13, 2011, Figueroa filed applications for SSI and SSDI, alleging that she had been unable to work since September 23, 2002 due to a number of impairments, including: anxiety, bipolar disorder, depression, muscle spasms, migraines, asthma, high blood pressure, neck problems, lower back problems, and memory problems. [Tr. 87-93, 624-34.] Her application was denied initially on September 21, 2011 [Tr. 51-57, 645-53], and upon reconsideration on January 20, 2012. [Tr. 61-63, 667-69.]

---

[2] In her initial application for Social Security benefits, the plaintiff listed a number of additional impairments, as described below (Section II-B). The ALJ did not address these other impairments in his decision, and the plaintiff does not challenge that aspect of the denial. Thus, the Court does not address the additional alleged impairments in this opinion.

On January 13, 2013, at Figueroa's request, an administrative hearing was held before an ALJ, at which the plaintiff was represented by counsel and testified. [Tr. 697-741.] The ALJ then elicited testimony from a Vocational Expert ("VE") [Tr. 732-36], who was also examined by the plaintiff's counsel. [Tr. 736-41.] The testimony of the plaintiff and the VE is described in greater detail below (Section II-D).

On February 20, 2013, following the hearing, the ALJ issued his written decision, finding that Figueroa was not disabled from September 23, 2002 through the date of the decision and thus, that she was not entitled to benefits. [Tr. 18-26.] On April 8, 2014, the Appeals Council denied the plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner, subject to judicial review in federal district court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). [Tr. 7-9.]

### C.   Statutory and Regulatory Framework; Five-Step Process to Evaluate Disability Claims

"The Social Security Administration is the federal agency charged with administering both the Social Security disability benefits program, which provides disability insurance for covered workers, and the Supplemental Security Income program, which provides assistance for the indigent aged and disabled." Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42 U.S.C. §§ 423 & 1381a).

The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); see also 42 U.S.C. §§ 416(i)(1) & 1382c(a)(3)(A). The inability must be severe, such that the claimant is unable to do his or her previous work or any other substantial

gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R.

§§ 404.1505-404.1511; see also Ross v. Astrue, No. CIV.A. 09-11392-DJC, 2011 WL 2110217,

at *2 (D. Mass. May 26, 2011).

When evaluating a disability claim under the Act, the Commissioner uses a five-step

process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the determination may be
> concluded at any step along the process. The steps are: 1) if the applicant is engaged
> in substantial gainful work activity, the application is denied; 2) if the applicant
> does not have, or has not had within the relevant time period, a severe impairment
> or combination of impairments, the application is denied; 3) if the impairment
> meets the conditions for one of the "listed" impairments in the Social Security
> regulations, then the application is granted; 4) if the applicant's "residual functional
> capacity" is such that he or she can still perform past relevant work, then the
> application is denied; 5) if the applicant, given his or her residual functional
> capacity, education, work experience, and age, is unable to do any other work, the
> application is granted.

Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

### D.    Administrative Hearing

#### 1.    Figueroa's Testimony[3]

At the administrative hearing held on January 13, 2013, Figueroa testified that she last

worked in a paid job approximately ten years earlier, taking care of her aunt on a part-time basis.

[Tr. 702-03.] She quit because she "started getting really depressed" and her grandmother "was

being real mean to me." [Tr. 704.] She stated, "I couldn't function at my job, so I just quit." [Id.]

She had not applied for any jobs recently and stated, "I don't think I can function at a job . . .

because I'm so tired" and "my body hurts." [Id.]

---

[3] Figueroa was given an opportunity to call witnesses on her behalf at the administrative hearing, but she
declined to do so. [Tr. 730.]

With respect to her mental impairments, Figueroa testified that she sometimes does not bathe, she sleeps a lot during the day, and she spends virtually all of her time in her bedroom ("I literally live in my bedroom"). [Tr. 709.] She has trouble sleeping at night. [Tr. 724.] She typically stays in her pajamas all day while at home and sometimes also wears pajamas out of the house to go to medical appointments. [Tr. 714.] She has not driven a car in years because she gets "scared" and has panic attacks. [Tr. 715.] She gets a ride to all of her medical appointments from the father of her daughter. [Tr. 723.] She takes a number of medications for anxiety, sleep, concentration, and pain. [Tr. 717-21.] These medications have the side effect of making her sleepy. [Tr. 717-20.] She reported watching television frequently and, if interested in a program, being able to follow and understand it. [Tr. 722.] However, she would not be able to watch a full movie from start to finish because she would fall asleep. [Tr. 727.] She does not participate in family gatherings because she lacks energy and interest. [Tr. 725.] She feels anxious and "desperate" in public places or around other people. [Tr. 728.] She has experienced suicidal thoughts and flashbacks to past events in her life. [Tr. 729.]

With respect to her pain and physical limitations, Figueroa stated that she could walk a quarter of the length of a football field before she would have to stop and rest for 15 or 20 minutes due to pain in her back, knees, and neck. [Tr. 710.] She experiences pain in her "butt" when sitting due to fibromyalgia and frequently has to alternate sitting and standing. [Tr. 711.] She could not sit for more than an hour at a time because of her back pain. [Tr. 712.] She reported that she could lift a gallon of milk but would be unable to lean down to lift it from the floor; at a store, someone would have to hand her the milk because of her inability to lean. [Tr. 712-13.] She also would not be able to bend at the waist and touch her toes. [Tr. 713-14.] She has problems reaching over her head due to arthritis. [Tr. 739.] She does not use any assistive

devices such as a cane, walker, or wheelchair. [Tr. 713.] She reported taking asthma medication twice a day, which prevents her from getting asthma attacks. [Tr. 730-31.]

### 2.      The Vocational Expert's Testimony

The ALJ then examined a VE, who described Figueroa's past work experience and responded to the ALJ's hypothetical questions designed to determine whether jobs exist in the national and regional economies for an individual of comparable age, educational background, work experience, and residual functional capacity ("RFC") as Figueroa. [Tr. 732-36.] The ALJ presented the VE with two hypothetical scenarios.

First, the ALJ asked the VE to assume a person of the plaintiff's age, education, and past work experience, who was limited to performing light work. This hypothetical claimant would be allowed to alternate sitting and standing at will and would be required to perform only occasional stooping, crouching, kneeling, and crawling. The claimant would need to avoid concentrated exposure to wetness, humidity, fumes, odors, dusts, and gases. Work would be limited to simple, routine, and repetitive tasks, with only occasional interaction with the public and co-workers. [Tr. 733-34.] The VE testified that with these limitations, Figueroa's past relevant work could not be performed. [Tr. 734.] However, the jobs of inspector, office cleaner, and soldering assembler could all be performed, and these jobs exist in significant numbers in the state and national economies. [Tr. 734-35.] Second, the ALJ changed the hypothetical to reflect a sedentary capacity, with the same additional limitations as in the first scenario. [Tr. 735.] The VE testified that such an individual could work as an office helper, bench worker, and electronic packer, all jobs existing in significant numbers in the state and national economies. [Tr. 735-36.]

Figueroa's counsel, too, examined the VE, modifying the ALJ's first hypothetical involving light work by adding further limitations. [Tr. 736-41.] In particular, he asked the VE to add a limitation on overhead reaching. [Tr. 740.] The VE testified that the job of office cleaner required only occasional overhead reaching (less than one-third of the time), and the other jobs of inspector and soldering assembler did not require any overhead reaching. [Id.] Figueroa's counsel also asked the VE to add a further limitation on kneeling, crouching, crawling, or stooping (rather than the "occasional" kneeling, crouching, crawling, or stooping contemplated by the ALJ). [Tr. 740-41.] The VE responded that this would rule out only the office-cleaning job, but not the jobs of inspector or soldering assembler. [Tr. 741.]

### E.    The ALJ's Decision

In his decision of February 20, 2013, the ALJ concluded that "[t]he claimant has not been under a disability, as defined in the Social Security Act, from September 23, 2002, through the date of this decision." [Tr. 26.] The ALJ, in reaching this conclusion, performed the five-step sequential evaluation required by 20 C.F.R. §§ 404.1520 & 416.920 (see supra at Section II-C). Figueroa does not dispute the ALJ's ultimate conclusions as to the first four out of the five steps in the sequential evaluation. [Pl.'s Mot. at 4.] However, she challenges: (1) the ALJ's determination of an RFC for light work, with certain limitations (which factors into the fourth and fifth steps); and (2) his finding at the fifth step that there are jobs in significant numbers in the national economy that the plaintiff can perform.

The five-step procedure resulted in the following analysis by the ALJ, which is detailed further in the ALJ's "Findings of Fact and Conclusions of Law." [Tr. 20-26.]

The first step of the inquiry is whether "the applicant is engaged in substantial gainful work activity." Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920). The ALJ found that "[t]he

claimant has not engaged in substantial gainful activity since September 23, 2002, the alleged onset date." [Tr. 20, at ¶ 2.] Thus, the ALJ proceeded to the second step.

The second step of the inquiry is whether the applicant has "a severe impairment or combination of impairments." Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920). The ALJ found that "[t]he claimant has the following severe impairments: anxiety-related disorder, fibromyalgia and chronic headaches." [Tr. 20, at ¶ 3.] In particular, he found that because these three impairments "negatively affect the claimant's ability to perform work-related activities," they are "considered to be severe as that term is defined in Social Security law and regulations." [Id.] As to Figueroa's alleged impairments of asthma and hypertension, the ALJ concluded (and Figueroa does not challenge his conclusion) that the "medical evidence of record reflects adequate control of both of these conditions with prescribed treatment. Thus, they are not considered 'severe' as that term is defined in the Social Security law and regulations." [Id.] Because the ALJ concluded that some of Figueroa's impairments are severe, he moved onto the third step.

The third step of the inquiry is whether "the impairment meets the conditions for one of the 'listed' impairments in the Social Security regulations." Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920). The ALJ concluded that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." [Tr. 20-21, at ¶ 4.] In her brief, Figueroa notes that a "Psychiatric Review Technique" form filled out by her treating psychiatrist, Dr. Carlos Neu ("Dr. Neu"), "suggests Appendix I Listings," but she nonetheless "accepts the finding by the ALJ that [her] condition did not 'meet or equal' an Appendix I Listing." [Pl.'s Mot. at 9.] Having

found that the plaintiff's impairments or combination of impairments did not meet the conditions

for one of the impairments listed in the Social Security regulations, the ALJ proceeded to the

fourth step.

The fourth step of the inquiry is whether the claimant's "'residual functional capacity' is

such that he or she can still perform past relevant work . . . ." Seavey, 276 F.3d at 5 (citing 20

C.F.R. § 416.920). The ALJ determined as follows with respect to the plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to perform light work as defined in 20
> C.F.R. 404.1567(b) and 416.967(b) except that she must avoid even moderate
> exposure to wetness, humidity, fumes, odors, dusts, gases and poorly ventilated
> areas, is limited to the performance of simple, routine and repetitive tasks, and can
> have only occasional interaction with the public, co-workers or supervisors.

[Tr. 22, at ¶ 5.] Based on this RFC, the ALJ concluded that "[t]he claimant is unable to perform

any past relevant work (20 C.F.R. 404.1565 and 416.965)." [Tr. 25, at ¶ 6.] The ALJ explained

that "[t]he claimant has past relevant work as a personal care attendant. This work required the

performance of activities precluded by the established residual functional capacity. Accordingly,

the claimant is unable to perform past relevant work." [Id.] The plaintiff does not challenge the

ALJ's ultimate conclusion at step four that in light of her RFC, she is unable to perform past

relevant work. She does, however, challenge his determination with respect to her RFC.

In connection with his analysis at step four, the ALJ provided a detailed explanation of

how he determined Figueroa's RFC. [Tr. 22-25.] He "considered all symptoms and the extent to

which these symptoms can reasonably be accepted as consistent with the objective medical

evidence and other evidence . . . ." [Tr. 22.] He also considered and summarized the opinions

expressed by the following treating sources: Gabriela Perez-Gil, MA (Figueroa's therapist), Dr.

Neu (her psychiatrist), Dr. Daniel Melville ("Dr. Melville," her primary care doctor), Dr. Laurie

Gordon ("Dr. Gordon," her neurologist), Dr. Roberto Feliz ("Dr. Feliz," her pain management

doctor), Dr. Andres Chaparro-Rincon (another treating psychiatrist), and Dr. Byron Garcia (another treating psychiatrist). [Tr. 22-25.] The ALJ then considered Figueroa's testimony at the administrative hearing. [Tr. 24.] He concluded, however, that "the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible." [Id.] The grounds for this credibility determination are addressed below (Section III-C).

Figueroa contends that in this section of his analysis, the ALJ improperly discredited portions of the opinions of two of her treating physicians: Dr. Neu and Dr. Feliz. She also argues that the ALJ improperly found her to be less than fully credible in her subjective complaints about her symptoms. For the reasons discussed below (Sections III-B and III-C), the Court disagrees and finds that the ALJ's handling of the treating source opinions and his assessment of Figueroa's credibility were both proper. Because the ALJ determined at step four that in light of her RFC, the plaintiff can no longer perform past relevant work, he went onto the fifth and final step.

The fifth step of the inquiry is whether "the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work." Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920). If the claimant "can make an adjustment to other work," he or she is not disabled. 20 C.F.R. §§ 404.1520(g) & 416.920(g). At step five, the Commissioner "has the burden . . . of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." Seavey, 276 F.3d at 5. Here, the ALJ relied on the VE's testimony to conclude that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform . . . ." [Tr. 25, at ¶ 10.] Specifically, he found that she would be able to

perform the jobs of inspector, office cleaner,[4] and solderer. [Tr. 26.] Because the ALJ found that "the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy," he concluded that "[a] finding of 'not disabled' is . . . appropriate . . . ." [Id.]

## III.    Discussion

### A.    Standard of Review

Section 205(g) of the Act, the statute under which Figueroa seeks judicial review of the denial of her application for benefits, provides, in relevant part:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, . . . may obtain a review of such decision by a civil action . . . brought in the district court of the United States for the judicial district in which the plaintiff resides . . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

42 U.S.C. § 405 (emphasis added). Thus, the Commissioner's findings are conclusive so long as they are supported by substantial evidence.

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The First Circuit has explained that:

> the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the Commissioner], not for the doctors or for the courts. We must uphold the [Commissioner's] findings in this case if a reasonable mind,

---

[4] The ALJ's opinion says "office clerk," but it is clear from the identifying "DOT" (Dictionary of Occupational Titles) number and the VE's testimony at the administrative hearing that "office cleaner" was intended.

> reviewing the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion.

Lizotte v. Sec. of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981) (citing Rodriguez v. Sec. of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). Moreover, the Court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec. of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (emphasis added) (citing Lizotte, 654 F.2d at 128).

In sum, "the court's function is a narrow one limited to determining whether there is substantial evidence to support the [Commissioner's] findings and whether the decision conformed to statutory requirements." Geoffroy v. Sec. of Health & Human Servs., 663 F.2d 315, 319 (1st Cir. 1981). "The ALJ's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Da Rosa v. Sec. of Health & Human Servs., 803 F.2d 24, 26 (1st Cir.1986) (per curiam); Ortiz v. Sec. of Health & Human Servs., 955 F.2d 765, 769 (1st Cir.1991)).

### B.     Weight Given to Treating Physicians' Opinions

The plaintiff argues that the ALJ failed to give appropriate weight to the opinions of two of her treating physicians: Dr. Feliz of Boston Pain Clinic (her pain management doctor) and Dr. Neu of Arbour Counseling Services (her psychiatrist). Specifically, she argues that "the finding[] of a residual functional capacity for light work is not supported by substantial evidence," and that "the ALJ violated the Treating Source Rule and gave insufficient and inappropriate weight to the opinions of Treating Physicians." [Pl.'s Mot. at 5.] For the reasons discussed in this section, the

Court disagrees and finds that the ALJ handled the opinions of Dr. Feliz and Dr. Neu properly.

### 1.    Dr. Feliz

Dr. Feliz of Boston Pain Clinic treated Figueroa for her physical symptoms including back pain, neck pain, muscle pain, muscle tenderness, stiffness, guarding, and limited range of motion. The record contains hundreds of pages of treatment notes from dozens of office visits with Dr. Feliz between at least late 2006 and 2012. He treated Figueroa's pain with spinal injections on a number of occasions. [E.g., Tr. 338, 379, 384, 444, 448, 453, 524.]

As the ALJ observed in his decision, Dr. Feliz consistently instructed Figueroa that to lessen her symptoms, she had to remain active and engage in an exercise program. For example, on March 20, 2007, he stated in a treatment note:

> Discussed with patient my clinical recommendations to remain as active as possible. This includes gentle stretching and strengthening exercises. And also that if at all possible to remain working. I have discussed with patient that it has been shown that patients who remain physically active and involved tend to do better in the long term than patients who opt to remain more sedentary.

[Tr. 436.] On November 7, 2008, he stated: "I have discussed and encouraged this patient to remain physically active and mentally active. . . . Physical activity and exercise will delay and/or prevent muscles and joints contractures and disuse atrophy which at times does develop with this type of injury." [Tr. 425-26.] On September 7, 2011, he stated:

> I discussed with patient that it's expected that with increased activity the pain will temporarily worsen but as activity progresses the body's muscles, ligaments and joints become reconditioned and slowly the overall pain diminishes.
>
> This patient needs to become involved in an aggressive program of physical therapeutic exercises to stretch, recondition and strengthen the core muscles of lumbar spine and abdomen. These muscles appear clinically to be soft, tender and deconditioned. It is my recommendation that, unless this program of therapeutic exercises is performed, this patient's pain will become chronic and recurrent.
>
> This was discussed at length with the patient. A program of therapeutic exercises is to be initiated.

[Tr. 293.] On September 28, 2011, he stated: "I had a prolonged discussion with this patient about my recommendations and the need to stay and remain active with physical activities and exercises. I discussed with the patient that a sedentary lifestyle and live to just take pain medications is not part of our treatment plan." [Tr. 286.]

On December 18, 2012, several weeks before the administrative hearing, Dr. Feliz completed a "Physical Residual Functional Capacity Assessment" form provided by the Social Security Administration. [Tr. 596-602.] In this form, he checked off boxes corresponding to his assessment of various exertional limitations. Pertinent to the plaintiff's arguments in this action, he opined that she could "lift and/or carry (including upward pulling)" a maximum of 10 pounds, either "[o]ccasionally" or "[f]requently"; "[s]tand and/or walk (with normal breaks) for a total of . . . at least 2 hours in an 8-hour workday"; and that her ability to "[p]ush and/or pull" with her upper or lower extremities was limited to no more than 15 pounds, with "no repetitive bending, twisting." [Tr. 597.] He further opined that she "must periodically alternate sitting and standing to relieve pain or discomfort." [Id.] He attributed the need to alternate sitting and standing to "Chronic Neck/Lower Back Pain: Degenerative Disc Disease." [Id.]

In his decision, the ALJ addressed Dr. Feliz's opinions in significant detail. He first summarized Dr. Feliz's treatment notes as a whole, highlighting, among other things, this doctor's "adamant" and repeated recommendation that "his patient must engage in physical activity/exercise in order to avoid recurrence of her symptoms." [Tr. 23.] In assessing Figueroa's credibility, the ALJ noted: "Dr. Feliz has specifically and repeatedly advised his patient to engage in more physical activity toward improving her overall physical health. Records do not reflect her following this recommendation." [Tr. 24.] Finally, as to Dr. Feliz's RFC assessment completed in December 2012, the ALJ stated:

The undersigned cannot give full weight to the opinion of Dr. Feliz, as to his patient's ability to perform physical work-related activities. In offering an opinion that his patient is unable to lift/carry more than 10 pounds, Dr. Feliz cites 'degenerative disc disease' and chronic neck/low back pain. There is no objective evidence in the record to support a diagnosis of 'degenerative disc disease'. Dr. Feliz's suggestion that his patient must alternate sitting/standing, and that her ability to push/pull with upper or lower extremities is limited is similarly unsupported by objective evidence.

[Tr. 24-25.]

The plaintiff argues that the ALJ erred in not giving full weight to Dr. Feliz's RFC assessment. She asserts that "Dr. Feliz is particularly well suited to comment on the physical abilities of Ada Figueroa based on his extensive experience with her [during] at least 45 office visits." [Pl.'s Mot. at 6.] Further, she suggests that the ALJ's finding is inconsistent with the Social Security regulation that provides:

> Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non-treating source.

[Pl.'s Mot. at 7 (citing 20 C.F.R. § 404.1527(c)(2)(i)).]

The Court concludes that in deciding not to give full weight to Dr. Feliz's RFC assessment, the ALJ did not violate 20 C.F.R. § 404.1527(c)(2)(i). In addition to the above-cited regulation, the Social Security regulations also provide that a medical opinion is afforded controlling weight only to the extent that it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in your case record." 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2). Notably, in his RFC assessment, Dr. Feliz attributed Figueroa's need to alternate sitting and standing to "degenerative disc disease" rather than to fibromyalgia, the impairment that the ALJ found to be severe at the

second step of his analysis. [Tr. 597.] As the ALJ observed, the record contains no objective evidence to support a diagnosis of "degenerative disc disease." There are no references to "medically acceptable clinical and laboratory diagnostic techniques" that would support this diagnosis. 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2). Similarly, the record lacks objective evidence to support the other exertional limitations identified by Dr. Feliz that the ALJ discredited, including the plaintiff's inability to lift more than 10 pounds or push or pull more than 15 pounds with her upper or lower extremities. Dr. Feliz never performed a functional capacity evaluation or other medically acceptable diagnostic technique that would substantiate such limitations. Rather, he appears to have relied upon the plaintiff's subjectively reported symptoms. As explained below (Section III-C), the ALJ reasonably concluded that Figueroa's statements concerning her symptoms were not entirely credible. See Colon v. Astrue, No. CIV.A. 11-30078-GAO, 2012 WL 4106764, at *5 (D. Mass. Sept. 19, 2012) (holding that the ALJ properly discounted a treating source's opinion "because many of his findings were based on the plaintiff's claims, not on medical signs or laboratory findings").

Thus, the Court finds that there was no error in the ALJ's determination not to give full weight to certain aspects of Dr. Feliz's RFC assessment.

### 2.    Dr. Neu

Dr. Neu was Figueroa's psychiatrist beginning in mid-2012, after she initially applied for benefits and less than one year before the administrative hearing conducted in January 2013. He treated her at Arbour Counseling Services, where, beginning in September 2003, she had previously been treated by a number of other mental health professionals. [Tr. 231-37.]

The record reflects that the plaintiff saw Dr. Neu a total of five times between June 2012 and November 2012. [Tr. 572-73, 574-76, 577-79, 587-90, 591-93.] Dr. Neu's notes from each

17

of these visits reflect diagnoses of posttraumatic stress disorder, bipolar disorder, panic disorder

(without agoraphobia), and "deferred diagnosis." [Tr. 572, 574, 577, 587, 591.] On each

occasion, Dr. Neu assigned Figueroa a Global Assessment of Functioning ("GAF") score of 55

[Tr. 573, 575, 588, 589, 591], indicating "[m]oderate symptoms (e.g., flat affect and

circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational,

or school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic and

Statistical Manual of Mental Disorders 32 (4th ed. 1994) ("DSM-IV") (emphasis in original).

> On June 21, 2012, Dr. Neu observed, in part:

> Ms. Figueroa presents as calm, attentive, fully communicative, casually groomed,
> underweight, but looks unhappy. . . . Signs of moderate depression are present.
> Demeanor is sad. . . . Ms. Figueroa convincingly denies suicidal ideas. . . . Cognitive
> functioning and fund of knowledge is intact and age appropriate. Short and long
> term memory are intact, as is ability to abstract and do arithmetic calculations. This
> patient is fully oriented. Vocabulary and fund of knowledge indicate cognitive
> functioning in the normal range. . . . There are signs of anxiety.

[Tr. 572.] On August 1, 2012, he observed, in part:

> Ms. Figueroa today denies any psychiatric problems or symptoms. Her behavior
> has been appropriate and uneventful. No side effects are described or evident. . . .
> Mood is euthymic with no signs of depression or elevation. . . . She convincingly
> denies suicidal ideas. . . . No signs of anxiety are present. There are no signs of
> hyperactive or attentional difficulties.

[Tr. 574.] On September 19, 2012, his observations were nearly identical, but he additionally

reported that the "[p]atient states that she has been feeling better. Actually looks much better

today." [Tr. 577.] On October 24, 2012, he observed that she was "[o]verall doing well" except

for night sweats and urinary incontinence at night. [Tr. 587.] Figueroa again "denie[d] any

psychiatric problems or symptoms" and "[n]o side effects [were] described or evident." [Id.] On

November 28, 2012, he reported that Figueroa "[s]tates she is psychologically stable," though

she complained of feeling tired and dizzy. [Tr. 591.]

On December 19, 2012, a few weeks before the administrative hearing, Dr. Neu completed a "Psychiatric Review Technique" form provided by the Social Security Administration. [Tr. 604-17.] In this form, he opined that Figueroa was impaired by a slew of mental disorders, including: affective disorders; anxiety-related disorders; posttraumatic stress disorder; bipolar disorder; panic disorder; depressive syndrome characterized by sleep disturbance, decreased energy, difficulty concentrating or thinking, and thoughts of suicide; generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity, apprehensive expectation, and vigilance and scanning; a persistent irrational fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; and recurrent and intrusive recollections of a traumatic experience ("flashbacks"). [Tr. 604, 605, 607, 609.] In a section of the form asking him to assign a rating to her functional limitations, Dr. Neu opined that she had moderate restriction in activities of daily living; moderate difficulties in social functioning; moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation. [Tr. 614.] He additionally opined that she had a medically documented history of a mental disorder "that has caused more than a minimal limitation of ability to do any basic work activity . . . ." [Tr. 615.]

On December 19, 2012, Dr. Neu also completed a "Mental Residual Functional Capacity Assessment" form provided by the Social Security Administration. [Tr. 619-21.] In this form, he opined that Figueroa was either not significantly limited or moderately limited in most areas of mental functioning, but markedly limited in two respects: her ability to interact appropriately with the general public, and her ability to respond appropriately to changes in the work setting. [Tr. 619-20.]

In his decision, the ALJ noted that Dr. Neu "has prescribed medication to help alleviate the claimant's psychiatric symptoms. Treatment notes consistently reflect a GAF of 55." [Tr. 22.] He found that Dr. Neu's opinion that "the claimant is markedly limited in her ability to interact with the general public . . . is inconsistent with his consistent findings of a GAF of 55." [Tr. 21.] Similarly, the ALJ explained:

> As for the opinion evidence, the undersigned cannot give weight to the opinion of Dr. Neu . . . . Dr. Neu opines that the claimant has an impairment affecting her ability to work, which is expected to last more than one year, and that her functioning is significantly limited secondary to her psychiatric condition. While Dr. Neu is a treating physician, he has only treated the claimant since April 2012, i.e. for less than one year. Under Social Security Ruling 96-2p, weight is not automatically given the opinion of a treating physician. This Ruling directs that the opinion of a treating physician only be accorded great weight where the opinion in question is not inconsistent with the weight of the evidence of record, and where it is supported by objective medical evidence. In this instance, Dr. Neu's opinion is unsupported by objective evidence. Records of his treatment of the claimant consistently reflect a GAF [global assessment of functioning] of 55. As defined in the **DSM-IV**, published by the American Psychiatric Association, a GAF of 51-60 reflects, "moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning . . . ." While a GAF in this range reflects some limitations, it does not support a finding that functioning is precluded, or even severely limited. The undersigned must give greater weight to contemporaneous treatment records than to an opinion offered solely to support the claimant's application for benefits based upon an inability to work, especially where that opinion is inconsistent with the contemporaneous treatment records.

[Tr. 24.]

The plaintiff argues that the ALJ failed to give appropriate weight to Dr. Neu's opinion. [Pl.'s Mot. at 8-10.] In particular, she claims that Dr. Neu's opinions expressed in the Social Security forms that he completed "are <u>consistent</u> with the serial findings of the psychiatric care providers," and that "the limitations proffered by Dr. Neu . . . match the limitations found in the dozens of office visits with the psychiatric care professionalist [*sic*] and her own testimony." [<u>Id.</u> at 9-10.] She also points to two instances in the record, in 2003 and 2011, where other mental health professionals previously assigned a GAF score of 50 to Figueroa [<u>id.</u>; Tr. 235, 250],

indicating "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work)." DSM-IV at 32. She argues that because a GAF score of 50 indicates serious symptoms or a serious impairment in functioning, the ALJ should not have rejected Dr. Neu's opinion for its apparent inconsistency with Dr. Neu's consistent assignment of a GAF score of 55 (indicating only moderate symptoms or a moderate difficulty in functioning).

The plaintiff's arguments misunderstand the ALJ's basis for discrediting Dr. Neu's opinion. The ALJ did not simply disregard the earlier GAF scores of 50 assigned by other mental health professionals, and in fact, he references those earlier scores in other parts of his decision. [Tr. 23, 24.] Nor did he reject Dr. Neu's opinion because he concluded that it was inconsistent with the opinions of other mental health professionals who treated Figueroa. Rather, the ALJ found internal inconsistency between Dr. Neu's repeated assessment of a GAF score of 55 and his opinion offered in support of her disability claim that she was "markedly" limited in her ability to interact with the general public, and that she was so significantly limited that she could not work. [Tr. 21, 24.] Given that Dr. Neu consistently assigned a GAF score of 55 to Figueroa, and in light of the narrative descriptions found in Dr. Neu's five treatment notes from June 2012 to November 2012, the ALJ reasonably concluded that Dr. Neu's "opinion is inconsistent with the contemporaneous treatment records." [Tr. 24.]

In addition to this finding of internal inconsistency, the ALJ also discounted Dr. Neu's opinion based on the fact that he had been treating Figueroa for less than one year when he reached his opinion. [Tr. 24.] This short treatment period particularly stands out given the plaintiff's alleged disability onset date of September 23, 2002, nearly a decade prior to her seeing

Dr. Neu.

For these reasons, the Court concludes that the ALJ did not err in not giving weight to the

opinion of Dr. Neu.

### C.      Credibility Assessment of the Plaintiff

The plaintiff next argues that the ALJ erred in assessing her credibility. The ALJ made

the following credibility determination in his written decision: "After careful consideration of the

evidence, the undersigned finds that the claimant's medically determinable impairments could

reasonably be expected to cause the alleged symptoms; however, the claimant's statements

concerning the intensity, persistence and limiting effects of these symptoms are not entirely

credible for the reasons explained in this decision." [Tr. 24 (emphasis added).]

The ALJ stated a number of reasons in support of this credibility determination. First, he

considered Figueroa's testimony at the administrative hearing. [Tr. 24.] He found it noteworthy

that although she alleged an inability to work due to a disability, she acknowledged having left

her last job as a home health attendant due to a dispute with her grandmother, rather than solely

as a result of her impairments. [Id.] The ALJ also found it significant that "the treatment the

claimant has received is routine/conservative. She has not undergone any surgical procedures for

her back or neck; none have been recommended." [Id.] Further, he cited the fact that "Dr. Feliz

has specifically and repeatedly advised his patient to engage in more physical activity toward

improving her overall physical health. Records do not reflect her following this

recommendation." [Id.] He additionally noted that "[t]he claimant's report of side effects of

medications is not documented in the record." [Id.] As to Figueroa's allegations of disabling

mental illness, the ALJ stated that he "cannot find her allegations fully credible" because her

statements concerning the severity of her panic attacks, anxiety, and depression were belied by

her treating mental health professionals' consistent opinion that "she is functioning at a GAF level of 50-55." [Id.] He noted that while a GAF level in this range "reflect[s] some moderate limitation in functioning[,] it does not support a finding that functioning is precluded, or even severely limited." [Id.]

Thus, the ALJ cited a variety of factors in support of his credibility determination, including the consistency of the plaintiff's statements both internally and with other record evidence, the level of treatment prescribed compared to the level of her complaints, and her lack of compliance with recommended treatment measures. Such considerations are both reasonable and consistent with the Social Security regulations. See 20 C.F.R. §§ 404.1529(c)(3) & 416.929(c)(3) (setting forth factors bearing on credibility determination); SSR 96-7, Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186 (1996) (setting forth additional factors). As the Commissioner notes, Figueroa does not acknowledge the ALJ's stated reasons for finding her to be less than fully credible, much less challenge those reasons. Instead, she asserts that the ALJ merely "employed the standard boilerplate credibility statement employed in most denials." [Pl. Mot. at 11.] This assertion is not accurate, however, in light of the supporting reasons discussed above.

"A fact-finder's assessment of a party's credibility . . . is given considerable deference and, accordingly, a reviewing court will rarely disturb it." Anderson v. Astrue, 682 F. Supp. 2d 89, 96 (D. Mass. 2010) (rejecting a Social Security claimant's argument that the ALJ erroneously discredited his testimony); see also Irlanda Ortiz v. Sec. of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) ("It is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the evidence is for the [Commissioner], not the courts.") (internal citations omitted). Here, the

ALJ properly considered factors bearing on Figueroa's credibility and concluded that she was not fully credible. The Court will not overturn the ALJ's credibility finding.

### D.      Assessment of the Combined Impact of the Plaintiff's Impairments

The plaintiff also argues that the ALJ failed to properly assess the combined impact of the three impairments that he found to be severe: her anxiety-related disorder, fibromyalgia, and chronic headaches. She suggests that the ALJ violated Social Security Ruling ("SSR") 86-8, which provides that:

> [w]hen assessing the severity of multiple impairments, the adjudicator must evaluate the combined impact of those impairments on an individual's ability to function, rather than assess separately the contribution of each impairment to the restriction of function as if each impairment existed alone. When multiple impairments, considered in combination, would have more than a minimal effect on the ability to perform basic work activities, adjudication must continue through the sequential evaluation process.

SSR 86-8, The Sequential Evaluation Process, 1986 WL 68636, at *2 (1986).

Having carefully reviewed the ALJ's decision, the Court concludes that the ALJ properly considered the combined effects of Figueroa's anxiety, fibromyalgia, and headaches. At multiple points in his decision, the ALJ acknowledged his obligation to consider the plaintiff's impairments in combination. [Tr. 18, 19, 20, 21.] He also acknowledged his obligation to consider the entire record and all of the plaintiff's symptoms. [Tr. 18, 20, 22.] Further, he discussed each of Figueroa's severe impairments "in significant enough detail to satisfy SSR 86-8." Gaudet v. Astrue, No. CIV.A. 11-11895-RGS, 2012 WL 2589342, at *7 (D. Mass. July 5, 2012). The Court concludes, therefore, that there was no error in failing to consider the combined effect of the plaintiff's impairments.

### E.      Consideration of the Plaintiff's Chronic Headaches

Finally, the plaintiff asserts that "[s]adly lost in the ALJ's evaluation of Ms. Figueroa's limitations are the deleterious effects of her headaches." [Pl.'s Mot. at 10.] Aside from citing where in the record her headaches are discussed, she does not elaborate any further on this claim. She does not explain how, in her view, the ALJ should have evaluated her headaches differently, nor does she point to any particular limitation attributable to her headaches that the ALJ failed to consider.

The Court concludes that the ALJ properly considered the effects of Figueroa's headaches. At the second step of the inquiry, he found that her chronic headaches, along with her anxiety-related disorder and her fibromyalgia, were severe impairments within the meaning of the Social Security law and regulations. [Tr. 20, at ¶ 3.] He expressly acknowledged that her headaches "negatively affect the claimant's ability to perform work-related activities." [Id.] In contrast, he found that her asthma and hypertension were not severe because they were adequately controlled with prescribed treatment. [Id.] At the fourth step of the inquiry, in determining her RFC, the ALJ considered and summarized a number of treating source opinions. He noted that Dr. Melville, the plaintiff's primary care doctor, had diagnosed her with "chronic headache mixed type including migraine." [Tr. 22.] He also considered the opinion of Dr. Gordon, the plaintiff's neurologist, that "the claimant's headaches are of the 'tension type variety, compounded by analgesic overdose and she also has migraines' which are exacerbated by the claimant's depressive condition." [Tr. 23.] The ALJ made note of Dr. Gordon's recommendation of "[c]onservative treatment, including heat, massage and neck support at night" for Figueroa's headaches. [Id.]

Thus, the ALJ's analysis included a determination that Figueroa's chronic headaches are a severe impairment that negatively affect her ability to work, and a review of the treating source opinions relevant to her headaches. Figueroa does not posit anything more that the analysis should have included with respect to her headaches. The Court therefore concludes that the ALJ appropriately considered the limiting impact of Figueroa's headaches in determining that she was not disabled.

## IV.    Conclusion

For all the reasons detailed herein, the plaintiff's Motion for Judgment [Dkt. 14] is DENIED, and the defendant's Motion to Affirm the Commissioner's Decision [Dkt. 24] is ALLOWED.

**SO ORDERED.**

Dated:  July 21, 2015

/s/ Allison D. Burroughs
Allison D. Burroughs
United States District Court Judge